UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KATHLEEN A. REED,

                         Plaintiff,                                      03-CV-6235T

v.                                                                       **DECISION**
                                                                         **And ORDER**
MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

                         Defendant.

_____

## INTRODUCTION

Plaintiff, Kathleen A. Reed ("Reed" or "plaintiff") brings this action pursuant to the Social Security Act, codified at 42 U.S.C. § 405(g) and 1383(c)(3), seeking review of a final decision of the Commissioner of Social Security, finding that she is no longer under a disability as of October 1, 1998 due to medical improvement and is therefore not entitled to continuing Disability Insurance Benefits ("DIB") after that date or any Social Security Income benefits ("SSI"). Specifically, Reed alleges that the decision of an Administrative Law Judge ("ALJ") who heard her case was erroneous because it was not supported by substantial evidence contained in the record, or was legally deficient and therefore she is entitled to judgment on the pleadings.  The Commissioner moves for judgment on the pleadings on the grounds that the ALJ's decision was correct, was supported by substantial evidence, and was made in accordance with applicable law.

For the reasons that follow, this Court finds that the Commissioner's decision is not supported by substantial evidence and accordingly I grant the plaintiff's motion for summary judgment and determine that plaintiff is entitled to continuing DIB benefits and SSI benefits, with

the exception that the plaintiff is not to be paid for one month of DIB benefits due to engaging in substantial gainful activity beyond the trial period and reentitlement period.

## **BACKGROUND**

On October 28, 1993 plaintiff Kathleen A. Reed, a thirty-five year old with a high school education filed an application for disability insurance benefits claiming that she had become unable to work as a painter as of December 6, 1992 because of swelling, dislocation and discomfort of the right knee, and loss of muscle control in the right leg. (Tr. 19, 64-67). On November 21, 1994 the ALJ held that the plaintiff had been disabled since December 6, 1992 from a right knee condition that met the criteria of Section 1.13 of Appendix 1, Subpart P, Regulation No. 4. (Tr. 208-15). Upon continuing review the Agency determined that as of October 1, 1998 the plaintiff was no longer disabled due to medical improvement and that her benefits would terminate on December 31, 1998. (Tr. 217-28, 237-39). The plaintiff's request for reconsideration was denied (Tr. 240-53, 262-94).

On March 27, 2000 the ALJ, based on a hearing and the evidence in the record, upheld the Agency's decision that the plaintiff was no longer entitled to DIB as of October 1, 1998 due to medical improvement of her condition and that her benefits would terminate on December 31, 1998. (Tr. 19-28, 564-76). A disability is defined by 42 U.S.C. § 423(d) as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…" 42 U.S.C. § 423(d) (1991). The ALJ determined that plaintiff was not engaged in substantial gainful activity; that plaintiff had status post tibial tuberosity transfer procedure and a moderate degree of degenerative arthritis of the lumbrosacral

spine, which are severe impairments; that plaintiff's mild disc narrowing at C4-5, C6-7, mild reactive airway disease, allergic rhinitis, and alleged depression were not severe impairments; that plaintiff's conditions either individually or in combination with her other impairments did not meet or equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4; that plaintiff's statements concerning her impairments and their impact on her ability to work are not entirely credible; that plaintiff did not have the capacity to perform her past relevant work; and that plaintiff retained the functional capacity to perform a reduced range of light work and the full range of sedentary work. (Tr. 27-28).  On January 8, 2002 Reed's appeal of the ALJ's decision to the Appeals Council was denied, and on January 22, 2002 the plaintiff sought review of this decision.  (Tr. 7-8, 595-96, 876). On November 25, 2002 this Court dismissed the plaintiff's complaint and upon appeal to the Second Circuit Court of Appeals the matter was remanded to the Commissioner for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g) by a Stipulated Order entered on June 23, 2003 .  (Tr. 863, 876).  On September 8, 2003 this Court entered an Order vacating the dismissal of plaintiff's complaint and remanded the matter to the Commissioner for further administrative proceedings.  (Tr. 877).

The plaintiff filed again for DIB and SSI on July 12, 2001 alleging disability from June 10, 2001 due to screws operatively placed in her right knee, and problems from her left pelvis, left hip, lower back, and depression.  (Tr. 610-14, 821-24, 877).  These applications were denied initially on September 18, 2001 and based on a hearing held on October 7, 2002 the ALJ concluded on January 22, 2003 that the plaintiff was not disabled.  (Tr. 523-35, 538-63, 577-91).  The ALJ determined that plaintiff was not engaged in substantial gainful activity since June 21, 2001; that plaintiff had a combination of impairments considered "severe"; that plaintiff's conditions either individually or

in combination with her other impairments did not meet or equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4; that the plaintiff retains the residual functional capacity to perform a wide range of light work; and that plaintiff does have the capacity to perform her past relevant work as a purchasing coordinator.  (Tr. 534-35).  The plaintiff's appeal of the ALJ's decision to the Appeals Council was denied on May 8, 2003.  (Tr. 517-19).  A request for review was timely filed on May 20, 2003.  (Tr. 877).  On September 12, 2003 by Stipulation and Order this Court remanded the plaintiff's claims back to the Commissioner for further proceedings and to consolidate plaintiff's claim for continued benefits and her 2001 claims.  (Tr. 866-67).  The Appeals Council remanded the case pursuant to this Order and directed that the case be assigned to a new ALJ.  (Tr. 905-6).

The ALJ held a hearing on October 4, 2006 pursuant to this remand order.  (1029-72).  On November 9, 2006 the ALJ held that the plaintiff was not under a disability as of October 1, 1998, due to medical improvement and additionally denied her 2001 SSI claim.  (Tr. 876-96).  In this decision the ALJ found that the plaintiff's depression and post tibial tuberosity transfer procedure were not severe impairments; that the plaintiff had engaged in substantial gainful activity from September 2000 to June 21, 2001; that none of the plaintiff's impairments either individually or in combination with her other impairments met equaled one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4; that as of October 1, 1998 the plaintiff retained the residual functioning capacity to perform a wide range of light and sedentary work, and is able to sit, stand or walk for four hours each in an eight hour day, but must avoid concentrated exposure to extreme cold, wetness, humidity, fumes, odors, dust, gases, poor ventilation and hazardous machinery; that the plaintiff is capable of performing her past relevant work as a purchasing coordinator  (Tr. 887, 891, 894-95).

By Stipulation and Order dated March 27, 2007 this court's prior remand order was vacated and the plaintiff's case was reopened in district court. The plaintiff's consolidated civil action is now on appeal before this Court.

### DISCUSSION

I.      Jurisdiction and Scope of Review

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Disability Insurance Benefits. That section also directs that when considering such a claim, the court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is defined as " such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). Section 405(g) thus limits the court's scope of review to determining whether or not the Commissioner's findings are supported by substantial evidence. See, Mongeur v. Heckler, 722 F.2d 1033, 1038 (2nd Cir. 1983) (finding that the reviewing court does not try a benefits case de novo). The court is also authorized to review the legal standards employed by the Commissioner in evaluating the plaintiff's claim.

"Though [the court] must credit an ALJ's findings if supported by substantial evidence, we retain a responsibility to conduct a searching inquiry and to scrutinize the entire record, having in mind that the Social Security Act…is remedial in purpose." *citing* McBrayer v. Secretary of Health and Human Services, 712 F.2d 795, 798-99 (2nd Cir. 1983); Dousewicz v. Harris, 646 F.2d 771, 773 (2nd Cir. 1981). Defendant asserts that the decision was reasonable and is supported by the evidence in the record, and moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Under Rule 12(c), judgment on the pleadings may be granted where the material

facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639 (2nd Cir. 1988).

A District Court should order payment of benefits in cases where the record contains persuasive proof of disability and remand for further evidence would serve no purpose. Carrol v. Sec. of Health and Human Serv., 705 F.2d 638 (2nd Cir. 1981). The goal of their policy is "to shorten the often painfully slow process by which disability determinations are made." Id. Because the court finds that (1) the ALJ's decision was not supported by substantial evidence and (2) the record contains substantial evidence of disability, such that further evidentiary proceedings would serve no purpose, the plaintiff is awarded DIB and SSI benefits, subject to the exception that a month and a half of benefits be withheld due to the plaintiff's substantial gainful activity beyond the trial work period and three months of the reentitlement period.

II.     Vocational History.

The plaintiff worked as a part-time office clerk at Schweitzer Aircraft from January to April 1998. (Tr. 35, 38, 325, 378). The plaintiff was then employed by Corning Inc. as a clerk in the purchasing department from September 2000 to June 2001. (Tr. 556, 704, 708-9). From this work the plaintiff earned $6,076.00 in 2000 and $15,696.00 in 2001. Reed was later terminated from her position at Corning due to missed time. (Tr. 556, 625, 647, 715). The plaintiff testified that her job at Corning lasted nine and a half months. (Tr. 1053).

III.     Medical History.

At an examination on June 29, 1989 Dr. George R. Pokorny diagnosed the plaintiff with acute subluxation of the right kneecap. (Tr. 140). After an examination on October 12, 1989

Dr. Pokorny diagnosed the plaintiff with recurrent dislocation of the right patella and planned to have the plaintiff undergo surgery for a lateral release and medial reefing of the right knee. (Tr. 139). On November 6, 1989 Dr. Pokorny performed tibial tubical elevation, medial displacement and lateral release and medial reefing surgery on the plaintiff's right knee at the Corning Hospital. (Tr. 144-48).  On February 8, 1991 Dr. Pokorny performed patellar tendon transfer surgery on the plaintiff's right knee at the Corning Hospital.  (Tr. 141-42, 163-65).  On March 17, 1993 Dr. Kenneth DeHaven performed distal and lateral tibial tubercle advancement surgery on the plaintiff's right knee. (Tr. 156, 173, 176-82).  Despite these surgeries a CT scan on October 12, 1993 showed medial subluxation of the patella with muscular contraction.  (Tr. 202).

The plaintiff sought treatment at the Guthrie Clinic by Dr. Mario L. Lecuona from November 1993 to August 1994.  (Tr. 332, 334, 336, 338).  At an examination on November 24, 1993 Dr. Lecuona opined that the plaintiff's disability of her right knee is marked, but partial. (Tr. 332). On April 25, 1993 Dr. Lecuona noted that the plaintiff has good motion in the right knee, but subluxation of the patella on movements. (Tr. 334).  The plaintiff complained of buckling and recurrent swelling of the right knee at an examination on June 14, 1994. (Tr. 336).  Reed's knee continued to subluxate medially on flexion extension. Id.  At an examination on August 2, 1994 the plaintiff demonstrated good motion of the right knee, but the plaintiff's right patella continued to subluxate on flexion.  (Tr. 338).  Dr. Lecuona opined that the plaintiff has a permanent partial disability. On October 26, 1994 Dr. Juan Llompart opined that the plaintiff's knee impairment met the 1.13 Listing. (Tr. 206).

Dr. Lecuona examined the plaintiff on March 21, 1995 and found good motion in the right knee, but a sinuous patellar tract. (Tr. 342).  The plaintiff's right knee did not demonstrate any

instability, although she had very hypotonic muscles in general.  Dr. Lecuona continued his diagnosis of permanent partial disability.  Id.  The plaintiff returned to Dr. Lecuona on June 13, 1995 because of lower back pain that was aggravated by prolonged sitting.  (Tr. 343).

After an examination on December 27, 1995 Dr. Lecuona reported that there is good motion of the right knee and lax or hypotonic muscles.  (Tr. 347).  X-rays of the right knee performed on this day showed a well healed tibial tuberosity transfer procedure with an otherwise normal right knee.  (Tr. 351).  Dr. Ralph Zehr noted that the position and alignment in the right knee appeared stable compared to the examination of November 10, 1989 and the joint spaces were well-maintained.  Id.  Dr. Lecuona concluded that the plaintiff has a permanent partial disability of the right knee of at least a moderate degree.  (Tr. 347).  On May 31, 1996 Dr. Lecuona opined that there had been no change in the plaintiff's right knee condition.  (Tr. 349).

On June 19, 1996 the plaintiff returned to the Guthrie Clinic because she claimed to have been depressed for two years.  (Tr. 356).  The plaintiff started attending counseling on a weekly basis and was prescribed Paxil.  (Tr. 357).  During an examination on June 26, 1996 the plaintiff reported that she was walking with her husband every day.  (Tr. 358).  Her depression eventually improved with the medication and counseling.  (Tr. 359).

Reed sought treatment with Dr. Elliot Rubenstein for sinus and respiratory problems on October 6, 1997.  (Tr. 392).  The plaintiff complained that she has had a stuffy and running nose and itchy throat, ears and eyes for two to three years.  (Tr. 393).  Dr. Rubenstein prescribed Zyrtec, Flovent and Flonase inhalers and for the plaintiff to continue the Maxair inhaler.  (Tr.  392).  Dr. Rubenstein diagnosed the plaintiff with seasonal/perennial allergic rhinitis and asthma with exacerbations.  Id.  A pulmonary function test was performed on November 6, 1997 and

demonstrated a mild obstructive signal.  (Tr. 397, 412).  On December 11, 1997 the plaintiff underwent an allergy evaluation which revealed a strong positive reaction to house dust, dust mites and several borderline reactions.  (Tr. 398).  Dr. Rubenstein noted that the plaintiff's lungs had a good air exchange with no rales or rhonchi.  Id.  The plaintiff received allergy desensitization injections from December 1997 to September 1998.  (Tr. 401-2, 404-5, 407-8).  After an examination on May 21, 1998 Dr. Rubenstein noted that the plaintiff continued to have good air exchange.  (Tr. 403).

A consultative examination was performed by Dr. Wesley Canfield on September 14, 1998. (Tr. 377-81).  X-rays of the plaintiff's right shoulder, left hip, and right knee were taken on this day. (Tr. 378).  The plaintiff's respiratory rate was normal and her chest was clear to auscultation and percussion.  Id.  Upon examination Reed's deep tendon reflexes were normal and symmetric in the upper and lower extremities, except for the Achilles tendon reflex which couldn't be elicited. (Tr. 379).  The range of motion of the plaintiff's knee was normal, but there was marked laxity of the patella on the right knee.  There was no other unusual instability in the right knee joint.  The plaintiff's straight leg raising in the sitting and supine position did not elicit low back pain.  The plaintiff's gait was within normal limits, she could stand on her heels and toes reasonably well, her tandem walk was performed accurately, and her Romberg sign was negative.  Dr. Canfield diagnosed the plaintiff with reactive airway disease, status post right patellar tendon surgery that has manifested in a markedly lax patella, status post right clavicle fracture that is asymptomatic at this point, and left hip pain that is most likely soft tissue in etiology.  Dr. Canfield opined that the plaintiff's prognosis was fair and that she cannot perform sedentary work because of increased pain in her left

hip and should avoid increased ambulation with twisting and/or kneeling and squatting because of her right knee condition.  Id.

X-rays of the plaintiff's left hip, right knee, and right shoulder were taken on September 15, 1998 at the Riverfront Medical Services by Dr. Joseph Scrivani.  (Tr. 382).  The x-ray of the plaintiff's right knee revealed a healed osteotomy for relocation of the patella tendon, the osteotomy was bridged by two anterior screws, and the lower pole of the patella suggested previous fracture with some spur formation.  The x-ray of the plaintiff's left hip showed a healed fracture at the left iliac wing, intact hip joint, and some spur formation at the junction of the femoral head and neck laterally without loss of joint space. The x-ray of the plaintiff's right shoulder showed healed fractures of the right clavicle and 1st and 2nd ribs anteriorly, and the remaining osseous, joint, and soft tissue structures of the shoulder were normal.

The plaintiff returned to Dr. Rubinstein on September 29, 1998 with complaints of asthmatic symptoms at night and wheezing. (Tr. 404).  Dr. Rubenstein diagnosed the plaintiff with asthma and allergic rhinitis and added a prescription for Allegra.  (Tr. 404).

On November 15, 1998 Dr. Baleshwar Frasad completed a Physical Residual Functional Capacity Assessment after review of the plaintiff's medical records.  (Tr. 254-61).  Dr. Frasad diagnosed the plaintiff with status post right patellar surgery, asthma, status post left hip pain, and a right clavicle fracture.  (Tr. 254).  Dr. Frasad opined that the plaintiff could stand and/or walk at least 2 hours in an 8 hour day, sit about 6 hours in an 8 hour day, occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, was limited in her ability to push or pull in her lower extremities, and can occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 255).  The plaintiff should

avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation.  (Tr. 258).

The plaintiff visited the emergency room of Corning Hospital on November 29, 1998 with complaints of back pain and a swollen right knee after allegedly being struck by a police car's bumper in the back of her knees.  (Tr. 435, 695).  X-rays taken of the plaintiff's right knee showed no sign of acute bone injury and some degenerative changes in the posterior portion of the patella. (Tr. 436).  X-rays of the plaintiff's lumbosacral spine showed no sign of acute bone injury, degenerative changes in the upper lumbar region, degeneration of a moderate degree in the lower lumbar region, lower thoracic and upper lumbar scoliosis with a convexity to the right side of a minimal degree.  (Tr. 437).  The sacroiliac joints showed some degenerative changes and the disc spaces are fairly well-preserved.  Id.  Dr. Lecuona reviewed these x-rays during an examination on December 4, 1998 and diagnosed the plaintiff with degenerative arthritis of the lumbar spine to a moderate degree.  (Tr. 413, 674).  Upon examination the plaintiff's forward flexion of her lumbar spine was 75 degrees, extension was 5 degrees, her straight leg raising was 90 degrees bilaterally, she was able to walk on her toes and heels, there was no weakness in her lower limbs, there was good motion of her hips, there was tenderness in her lumbrosacral area, and she exhibited the usual problems in her right knee.  Dr. Lecuona opined that there has been no change in the plaintiff's knee condition.  Id.

On January 22, 1999 the plaintiff was examined by Dr. Lecuona.  (Tr. 414).  The plaintiff complained of lower back pain and that her right kneecap still dislocates and that her right knee will sometimes give way causing her to fall.  Upon examination Dr. Lecuona found good motion of the right knee, mild crepitation of flexion/extension, and subluxation of the right patella on flexion

extension.   Reed was able to walk on her toes and heels and her reflexes were decreased but symmetrical.  The plaintiff's  forward flexion of her lumbar spine was 60 degrees, extension was 12 degrees and her straight leg raising was 80 degrees on the right and 75 degrees on the left. Dr. Lecuona opined that there has been no change in the condition of her right knee for the last few years and that the plaintiff's right knee condition was permanent.  Id.

The plaintiff was first examined by Dr. David Graham on February 12, 1999 for pain in her neck and along the medial border of her right scapula.  (Tr. 438).  The plaintiff had a normal neurological examination and she displayed good motion of the cervical spine, although hyperextending and lateral bending produced symptoms.  X-rays of the cervical spine showed some mild disc narrowing at C4-5 and C6-7 and the foramina were pretty clear.  Dr. Graham diagnosed the plaintiff with some early degenerative disc disease.  Id.

Reed underwent a chest x-ray on August 24, 1999 which revealed clear lung fields, normal pleurae and diaphragm, and moderate pleural tenting involving the right hemidiaphragm, which appeared unchanged since January 31, 1995.  (Tr. 463).

From April 7, 2000 to March 26, 2000 the plaintiff was treated by Dr. David Austin at the Guthrie Medical Group for low back pain with left buttock and leg radiation.  (Tr. 493-95, 497-98, 794-95, 798-99).  Reed complained that her axial back pain was worse than her leg pain and that the pain is worse when she sits or lays down, but the pain is relieved when she stands up or walks. (Tr. 493). Upon examination Reed had a negative straight leg raising test bilaterally, some decreased range of motion in forward flexion and lateral bending, 5/5 strength throughout with no neurological deficit, and her patellar and achilles tendon reflexes were 1+ bilaterally and symmetric.  Dr. Austin stated that Reed may have some discogenic disease which would explain her leg symptoms and

prescribed Celebrex and physical therapy twice a week for six weeks.  Id.  On May 9, 2000 an MRI of the plaintiff's lumbar spine was performed at the request of Dr. Austin.  (Tr. 496).  This MRI revealed that at the L4-L5 level there was a mild signal loss and mild narrowing of the disc space indicating early degenerative changes, minimal concentric bulging annulus, but no focal herniation of the disc, and no significant spinal stenosis.  At the L3-L4 level there were degenerative changes of a mild degree with narrowing and signal loss, minimal concentric bulging annulus, but no focal herniation of the disc, and no significant spinal stenosis.  Dr. Samuel Choi opined that there was mild degenerative changes of the disc spaces of L3-L4 and L4-L5, but no focal herniation nor spinal stenosis.  Id.  After reviewing the MRI results Dr. Austin concluded that the plaintiff has no herniated disc and no spinal stenosis

On March 26, 2000 the plaintiff admitted herself to Corning Hospital due to her low back pain.  (Tr. 699-700).  It was noted that the plaintiff was able to ambulate without any difficulty and the diagnosis was lumbar pain with sciatica.  (Tr. 699).  On June 15, 2000 Reed returned to the Corning Hospital again for her low back pain that radiated down to her left knee.  (Tr. 701).  Upon examination there was no gross evidence of motor or sensory loss, or paraspinal muscle spasm or tenderness.  Reed was diagnosed with lumbrosacral radiculopathy.  The plaintiff was given lumbar epidural steroid injections and discharged.  Id.

Dr. Lecuona completed an evaluation of the plaintiff's residual functioning capacity on September 5, 2000.  (Tr. 489-90).  Dr. Lecuona opined that the plaintiff can continuously stand and/or walk for 30 minutes, stand and/or walk for 2 hours total in an 8 hour day, can continuously sit for one hour, and can sit for 3 hours total in an 8 hour day.  (Tr. 490).

On January 25, 2001 the plaintiff returned to Corning Hospital for her low back pain that radiated down her left leg. (Tr. 704). She complained that her low back pain worsened when she was walking or sitting. There was no paraspinal tenderness, no spasms, and no motor or sensory deficits found after a physical examination. Id. The plaintiff was given a lumbar epidural steroid injection and nerve block, which controlled her pain. (Tr. 705, 707). The attending physician diagnosed the plaintiff with lumbrosacral radiculopathy and was discharged in stable condition. (Tr. 704,706).

The plaintiff sought treatment at the Guthrie Clinic on March 2, 2001 by Dr. Ruby J. Parveen. (Tr. 708-9). Reed complained of pain in her knee, and pain in the left buttock that radiated down to the left thigh. (Tr. 708). The plaintiff told Dr. Parveen that her pain was increased by sitting and lying down, but that she could sit as long as she did not bear weight on her hip. Upon examination the plaintiff's left hip flexion was 4-/5 in strength, her knee flexion and extension were at full strength, her dorsiflexion and plantar flexion were normal, her knee reflex was 1+, her gait was normal, and her heel walking, toe walking, and tandem gait were normal. (Tr. 709). There was no percussion tenderness in her lower back and upon palpation over the hip and sacroiliac joint there was no pain. However pain was produced on palpation of the left greater tuberosity. Dr. Parveen noted decreased sensation in the left anterior aspect of the thigh, but the rest of the sensory examination was normal. Dr. Parveen diagnosed the plaintiff with possible lumbar radiculopathy and recommended an MRI of the plaintiff's spine. Id.

An MRI of the plaintiff's lumbar spine was performed on March 20, 2001. (Tr. 813). Dr. Christopher Joy noted that there was decreased signal intensity and narrowing of the lower lumbar disc spaces, the disc margins were bulging about their circumference, and there was no focal

disc herniation, spinal canal stenosis or nerve root.  The remaining disc spaces were well-maintained, the lumber vertebral segments were well aligned, and the facet joints were fairly well maintained. Dr. Joy diagnosed the plaintiff with degenerative spondylosis.  Id.

The plaintiff was examined by psychiatrist, Dr. Deidre Finney on June 21, 2001 for depression.  (Tr. 804-7).  The plaintiff was taking prescribed antidepressants: Paxil, Prozac, Effexor, and Elavil.  (Tr. 805).  Reed reported that she had received a good performance review from her employer, but had missed too much work and had time card irregularities.  (Tr. 804).  Dr. Finney opined that the plaintiff appeared well-groomed, calm and cooperative and exhibited intact thought processes and insight, no hallucinations, and was fully oriented.  (Tr. 806).  Dr. Finney diagnosed recurrent major depression with a good prognosis and prescribed Effexor.  (Tr. 806-7).

Reed was seen five times from June 21, 2001 to July 25, 2001 by psychologist, Dr. Frank Bourke.  (Tr. 820).  The plaintiff had come to Dr. Bourke as a possible suicidal referral and he had recommended three weeks off of work.  Reed told Dr. Bourke that she was unable to keep up at work and had become increasingly anxious and depressed.  Dr. Bourke noted that the plaintiff's symptoms had ameliorated when she developed a behaviorally based action plan intended to deal with her situation more effectively.  Id.

On July 2, 2001 the plaintiff was again examined by Dr. Lecuona for discomfort in her left hip area.  (Tr. 680).  The plaintiff told Dr. Lecuona that she had discomfort in her left hip area posteriorly in the gluteal fold on the left side laterally in the trochanteric area, not further down and lateral portion of the left groin.  Physical examination findings were forward flexion of lumbar spine at 75 degrees and extension about 12 degrees, straight leg raising was 90 degrees bilaterally with slight discomfort in the left hip area, reflexes of the lower limbs were decreased but symmetrical,

and she was able to walk on her toes and heels.  Dr. Lecuona noted that there was no tenderness in the left trochanteric area of the lower back and there was no tenderness in the left lower quadrant.  X-rays of the plaintiff's hip and pelvis did not reveal anything "special" on the left side.  (Tr. 682).  Dr. Lecuona opined that the plaintiff has mild lipping of the femoral head and what appears to be a cyst in the superior portion of the acetabulum.  The plaintiff's back disc spaces were well-preserved in the lumbar spine and there was mild diffuse lipping, which was moderate, at L3-L4.  Dr. Lecuona diagnosed tenderness in the lateral gluteal area.  Id.

The plaintiff underwent an MRI of her left hip on July 10, 2001 by Dr. Timothy J. Greenan.  (Tr. 688).  Dr. Greenan noted that there was no evidence of tendinopathy, bursitis, avascular necrosis, or any abnormality of the anterior or posterior labra.  There was also no joint effusion, productive changes, and the left femoral head appeared unremarkable.  Id.

Reed was psychiatrically evaluated by psychologist, Dr. Stephen Tien on August 16, 2001.  (Tr. 715-19).  The plaintiff told Dr. Tien that she was not currently taking her antidepressant medication and was not undergoing psychotherapy.  (Tr. 715).  Reed had run out of her pain medications and had only been taking Tylenol and Motrin.  (Tr. 716).  During the examination the plaintiff was cooperative with adequate social skills, her eye contact was appropriate, her speech was reasonably fluent, her voice was clear, her expressive and receptive language were appropriate, and her gait and motor behavior was grossly normal. (Tr. 716-17). Reed's thought processes were coherent and goal directed, her sensorium was clear, she was oriented at all times, her recent and remote memory skills were intact, her cognitive functioning was estimated as average, and her insight and judgment appeared fairly good.  (Tr. 717).  The plaintiff was able to dress, bathe, groom herself and cook, but she had difficulties with activities of daily living due to depression.  (Tr. 717-

-16-

18).  Dr. Tien diagnosed the plaintiff with depressive disorder due to her termination from work and recommended psychiatric medication and psychotherapy.  (Tr. 718).  Reed's prognosis was evaluated as fair to good provided that she resume psychiatric treatment and gets help gaining employment. Id.

On August 27, 2001 Dr. Albert Kochersperger performed an orthopedic consultative examination of the plaintiff and noted that the plaintiff had left her job as a purchasing coordinator at Corning Inc. because of lost time due to a dislocating right knee cap, low back pain and left hip pain.  (Tr. 710).  Reed complained that she could only sit for about five to ten minutes and does not do any bending or lifting.  (Tr. 711).  The plaintiff stated that she experiences pain with sitting and walking and that she has subluxation of the right patellar several times a day.  Upon examination the plaintiff demonstrated a slow but balanced gait, the range of motion in both of her knees was 0 to 120 degrees, her knee reflexes were equal bilaterally, and there was no numbness in her lower extremities or focal motor weakness.  Her straight leg raising test was 60 degrees bilaterally with left posterior pain and low back pain noted on the left side, her hip motion was full with forward elevation bilaterally, and with interior and exterior rotation, abduction, and adduction on the right. (Tr. 711, 713).  However, backward extension of her hips was decreased bilaterally.  Id.  Reed's lumbrosacral motion was 0 to 30 degrees with low back discomfort noted, lateral bending at the right was 20 degrees, on the left it was 15 degrees with pain on the left bend,  no scoliosis was found, but Dr. Kochersperger did note that there is left-sided paravertebral muscle spasm.  (Tr. 711-12). Dr. Kochersperger diagnosed the plaintiff with lumbar syndrome with degenerative disc disease, persistent left hip pain, recurrent subluxation of the patella on the right knee, and bronchial asthma. (Tr. 712).  Dr. Kochersperger's prognosis was poor and opined that the plaintiff could walk 5-10

minutes, stand 5-10 minutes, sit 10-15 minutes, cannot bend or lift, and must climb stair one at a time.  Id.

Dr. Sury Putcha reviewed the plaintiff's medical record upon a request for medical advice by the New York State Office of Temporary and Disability Assistance and provided an assessment of the plaintiff's functional capacity on August 31, 2001.  (Tr. 720).  Dr. Putcha noted that the plaintiff was able to walk independently and on her heels and toes, her lumbar spine could flex to 75 degrees, and she was neurologically intact. Dr. Putcha opined that the plaintiff's impairments did not equal or meet the Listings.  Id.  Psychologist, Dr. C. Richard Noble completed a mental residual functioning capacity assessment on September 3, 2001 after review of the plaintiff's medical file. (Tr. 721–38).  Dr. Noble opined that the plaintiff had no significant mental impairments, except that she was moderately limited in her ability to work in coordination with or proximity to others without being distracted by them and also getting along with coworkers without distracting them or exhibiting behavioral extremes.  Id.  The plaintiff had a mild degree of limitation on her restriction of activities of daily living, difficulties in maintaining social functioning, deficiencies in maintaining concentration, persistence or pace and no repeated episodes of deterioration.  (Tr. 735).  Dr. Noble diagnosed the plaintiff with depressive disorder due to termination from work.  (Tr. 721).

On April 3, 2002 sought treatment from Dr. Lecuona for pain in the posterior gluteal area on the left side that radiated down to her left knee.  (Tr. 683-85).  Reed was able to walk on her toes and heels, but had some difficulty on her left side due to her left knee.  Forward flexion of the lumbar spine was 80-85 degrees, extension was 12 degrees, there was no weakness in her lower limbs or feet or ankles, reflexes were present except for the left knee, and the motion of her hips with straight leg raising was 85 degrees bilaterally.  X-rays of the plaintiff's lumbar spine and pelvis revealed no

scoliosis or obvious narrowing at the disc space, and a well preserved left hip joint.  The x-rays did show arthritis of the lumbar vertebra and lateral portion of the pelvis, mild to moderate lipping between L3 and L4 and mild lipping laterally of the hip at the level of the neck and head of the left hip joint.   Dr. Lecuona opined that the x-rays revealed no change compared with the x-rays taken in July 2001.  Id.

An MRI was performed on the plaintiff's spine by Dr. Christopher P. Rothstein on April 4, 2002 who noted that there was discogenic disease manifested by partial disc desiccation, disc space narrowing as well as diffuse posterior bulges at L3-L4 and L4-L5, and mild bilateral facet and ligamentous hypertrophy at L4-L5, right side greater than the left.  (Tr. 689).  There was no central canal spinal stenosis, HNP or neural foraminal stenosis and the visualized conus medullaris was unremarkable.  Id.

Reed was examined by Dr. Mala Sutton on September 10, 2002 for her annual physical evaluation.  (Tr. 809-11).  The plaintiff told Dr. Sutton that she was on Social Security Disability between 1992 and 2000, but then worked for Corning Inc. off and on for eight months.  Dr. Sutton noted that the plaintiff had pain in her right shoulder, upper back, and in the right upper extremity which was thought by a orthopedist in Elmira to be myofascial pain.  Id.  The plaintiff had good range of motion in her right knee, there was no spinal deformity or tenderness, and no other focal neurologic deficit in the lower extremity.  (Tr. 811).  Reed's asthma seemed to be well controlled although her allergies were not.  Dr. Sutton concluded that the plaintiff has a partial permanent disability, but will be able to engage in an occupation that does not involve lifting, prolonged, standing or sitting, or any repetitive movement involving the lower back.  Id.

On October 5, 2002 Dr. Sutton completed a medical report that concluded that the plaintiff was able to sit for 4 hours in an 8 hour workday, stand for 4 hours in an 8 hour workday, and walk for 4 hours in an eight hour workday. (Tr. 815-19). Dr. Sutton opined that the plaintiff could frequently lift up to 10 pounds, occasionally lift from 11 to 20 pounds, frequently carry up to 10 pounds, and occasionally carry 11 to 20 pounds. (Tr. 816). The plaintiff should avoid climbing, balancing, crouching and crawling and may occasionally stoop. (Tr. 818). Reed should avoid dust, temperature extremes, fumes, chemicals and moving machinery. (Tr. 819).

Reed was examined by Dr. Lecuona on December 31, 2002 for pain in her right knee. (Tr. 1009). The plaintiff told Dr. Lecuona that her right kneecap dislocates and the knee buckles occasionally. Dr. Lecuona did not find any joint effusion, but did find moderate crepitation on flexion extension of the right knee. There was good motion of the right knee, but there also was a sinuous tracking of the patella from flexion to full extension. Dr. Lecuona found that the patella subluxates laterally and the plaintiff's main discomfort is anterolaterally. Dr. Lecuona opined that the plaintiff has hypotonic muscles and diagnosed the plaintiff with chondromalacia of the patella with instability of the patella or subluxation of the right patella. Id.

On February 10, 2003 the plaintiff again visited Dr. Lecuona. (Tr. 1011). Reed had undergone x-rays of her cervical spine on January 21, 2003 which showed a straightening and slight reversal of the normal lordotic curvature and, in Dr. Lecuona's opinion, degenerative disc disease between C3-4 and C4-5 in the form of some narrowing and spurring. (Tr. 1011, 1017). The plaintiff complained of discomfort posterolaterally on the right side of the neck radiating towards the right trapezius, which was aggravated by the use of the right upper limb. (Tr. 1011). Dr. Lecuona opined that the movements of the plaintiff's neck were moderately restricted and that lateral flexion was

mildly restricted.  Id.  Dr. Lecuona examined the plaintiff on March 3, 2003 for complaints of pain in the right upper trapezius area.  (Tr. 1012).  Upon examination the plaintiff had excellent range of motion in her shoulders and neck with some discomfort with right lateral rotation and lateral bending.  Reed's muscular strength appeared to be 5/5 and equal bilaterally, deep tendon reflexes were 1+ and equal bilaterally, and Reed had a normal gait and station.  Dr. Lecuona diagnosed the plaintiff with a history of neck pain with x-ray evidence of degenerative disc disease at C3, C4, and C5 with neuropathic pain.  Id.

Reed met with Dr. Lecuona on September 2, 2003 for a follow-up examination regarding her cervical neck pain.  (Tr. 1015).  The plaintiff had underwent an MRI of her cervical spine that Dr. Lecuona opined showed degenerative disc disease at C4-C5 and C5-C6 with associated posterior osteophyte formation causing narrowing of the neural canal without evidence of spinal stenosis.  The plaintiff continued to have tenderness in the upper right trapezius area and had full range of motion of the shoulders and distal to that.  The plaintiff continued to have a normal gait and station and full muscular strength.  Id.  Dr. Lecuona prescribed a series of epidural nerve blocks to be performed. (Tr. 1016).  The plaintiff received these injections by Dr. Lee on September 11, 2003.  (Tr. 1020).

The plaintiff next saw Dr. Lecuona on April 10, 2006 for pain in her right knee pain. (Tr. 1027-28).  The plaintiff complained of recurrent dislocation of the right patella.   (Tr. 1027). Dr. Lecuona noted swelling and increased temperature of the right knee.  Id.  The plaintiff underwent x-rays of her right knee that showed two screws in the tibial tuberosity area left from the plaintiff's last surgery.  (Tr. 1028).  After review of these x-rays Dr. Lecuona opined that the patella is still slightly displaced medially Reed had a moderate degree of crepitation on flexion extension of the right knee, peripatellar tenderness, and no joint effusion.  (Tr. 1028).

IV.    <u>The ALJ's Holding that the Plaintiff was not Disabled as of October 1, 1998 is Not</u>

       <u>Supported by Substantial Evidence.</u>

Under 20 C.F.R. § 404.1594 medical improvement related to an individual's ability to work that rises to the level of allowing an individual to engage in substantial gainful activity must be shown to discontinue previously awarded medical benefits.  Medical improvement is defined as any decrease in the medical severity of the plaintiff's impairments, which were present at the time of the most recent favorable medical decision.  20 C.F.R. § 404.1594(b)(1).  Medical improvement is related to an individual's ability to work if there has been a decrease in the severity of the impairment present at the time of the most favorable decision and an increase in the claimant's functional capacity to do  basic work activities. 20 C.F.R. § 404.1594(b)(3).  Basic work activities means the ability and aptitudes necessary to do most jobs.  20 C.F.R. § 404.1594(b)(4).  When determining whether a plaintiff is able to engage in substantial gainful activity the current impairments of the plaintiff must be considered, not just the impairments present at the most recent favorable determination.  20 C.F.R. § 404.1594(b)(5).

If the most recent favorable decision was based on the fact that the plaintiff's impairments met or equaled the Listing of Impairments and the plaintiff's medical improvement results in the plaintiff no longer meeting the Listing then a medical improvement related to an individual's ability to work has occurred.  20 C.F.R. § 404.1594(c)(3)(i).  On November 21, 1994 the plaintiff's condition was found to meet then applicable Section 1.13 of Appendix 1, Subpart P, Regulation No. 4.  (Tr. 208-15).  Listing 1.13 involves "soft tissue injuries of an upper or lower extremity requiring a series of staged surgical procedures within 12 months after onset for salvage and/or restoration of major function of the extremity, and such major function was not restored or expected

-22-

to be restored within 12 months after onset." The plaintiff underwent surgeries on November 6, 1989, February 8, 1991 and March 17, 1993 to prevent the recurrent dislocation and medial subluxation of the plaintiff's right patella. Despite these surgeries the plaintiff's right patella continues to dislocate and displays medial subluxation.

A finding that there has been a decrease in medical severity must be based on improvement in the symptoms, signs, or laboratory findings associated with the plaintiff's impairment(s). 20 C.F.R. § 404.1594(b)(1). At a consultative examination on September 14, 1998 Dr. Canfield opined that the plaintiff had marked laxity of the patella on the right knee and that she could not perform sedentary work. (Tr. 379). X-rays taken on November 29, 1998 displayed degenerative changes in the posterior portion of the right patella. (Tr. 436). After reviewing these x-rays on December 4, 1998 Dr. Lecuona opined that there had no change in the plaintiff's right knee. (Tr. 413, 674). After an examination on January 22, 1999 Dr. Lecuona again opined that the plaintiff's knee condition had not changed over the years. (Tr. 414). Consultative examiner, Dr. Kochersperger diagnosed the plaintiff with recurrent subluxation of her right patella and opined that she could stand/walk 10-15 minutes and sit 10-15 minutes per day. (Tr. 710-12). Upon examination on December 31, 2002 Dr. Lecuona noted sinuous tracking of the right patella from flexion to full extension, patella subluxation laterally and opined that the plaintiff had hypotonic muscles and chondromalacia of the patella with instability or subluxation of the right patella. (Tr. 1009). On April 10, 2006, Dr. Lecuona after examining the plaintiff and reviewing the x-rays taken of the plaintiff's right knee opined that the plaintiff's right patella continued to be slightly displaced medially and found swelling, peripatellar tenderness, and a moderate degree of crepitation on flexion of the right knee,. (Tr. 1027-28).

At an examination on January 22, 1999 the plaintiff complained to Dr. Lecuona that her right kneecap would dislocate and gives way causing her to fall. (Tr. 414). Dr. Kochersperger noted at a consultative examination on August 27, 2001 that the plaintiff complained of subluxation of her right patella several times a day. (Tr. 710). The plaintiff continued to complain that her right kneecap dislocates and that her knee buckles at an examination with Dr. Lecuona on December 31, 2002. (Tr. 1009). At the latest examination with Dr. Lecuona in the record (April 10, 2006) the plaintiff stated that her right patella continued to dislocate. (Tr. 1027).

If the appendix level of severity is met or equaled, the individual is deemed, in the absence of evidence to the contrary, to be unable to engage in substantial gainful activity. 20 C.F.R. § 1594(c)(3)(i). Substantial evidence in the record establishes that the plaintiff's right knee's major function has not been restored after her three surgeries. Since medical improvement related to the plaintiff's ability to work has not occurred and no exception applies, the plaintiff's benefits will continue. 20 C.F.R. § 1594(a).

V.   Substantial Evidence Supports the ALJ's Finding That the Plaintiff Was Engaged in Substantial Gainful Activity During Her Work at Corning Inc.

Substantial gainful activity is work that involves doing significant and productive physical and mental duties and is done for pay or profit. 20 C.F.R. § 404.1510. Work is substantial even if it is done on a part-time basis and is gainful if done for pay or profit, whether or not profit is realized. 20 C.F.R. § 404.1572. Work that an individual is forced to stop or to reduce below the substantial gainful activity level after a short time because of an individual's impairment is considered an unsuccessful work attempt. 20 C.F.R. § 404.1574(a)(1). Earnings from an individual's unsuccessful work attempt will not show that an individual is able to do substantial gainful activity. Id. If an

individual performed work at the substantial gainful activity earnings level for more than 6 months then that work will not be considered an unsuccessful work attempt regardless of why it ended or was reduced below the substantial gainful activity earnings level.  20 C.F.R. § 404.1574(c)(5).

A trial work period is the period in which an individual may test his ability to work and still be considered disabled.  20 C.F.R. § 404.1592(a).  A trial work period lasts nine months and the months of work do not have to run consecutively.  Id.  The services performed within this trial work do not have to have to rise to the level of substantial gainful activity.  20 C.F.R.§ 404.1592(b).  The ALJ correctly found that the plaintiff's part-time job as an office clerk at Schweitzer Aircraft from January to April 1998 was a trial work period.  (Tr. 35, 38, 325, 378, 466, 879).  Considering this four months of work as well as the over nine months of work for Corning Inc. the plaintiff worked past the trial work period of nine months.

An individual is engaging in substantial gainful activity if her average earnings are more than $700 per month for the period July 1999 to December 2000.  20 C.F.R. § 404.1574 [Table 1].  The plaintiff in this case earned $6,076.00 while working at Corning Inc. from September, 2000 to January 1, 2001.  The plaintiff's average monthly income for this time was $2,025.33, therefore the plaintiff was engaged in substantial gainful activity at this time.  For any period after January 1, 2001 earnings will show that an individual engaged in substantial gainful activity if they average more than the amount for the previous year or an amount adjusted for the national wage growth.  20 C.F.R. § 404.1574(b)(2)(ii).  The plaintiff earned $15,696.00 from the period January 1, 2001 to June 21, 2001, which gives her a average monthly income of $2,342.60.  This average monthly income is therefore greater than what she earned in 2000.  The plaintiff performed work at the substantial

gainful activity earnings level for over 6 months and therefore cannot consider the period of work at Corning Inc. from September, 2000 to June 21, 2001 to be an unsuccessful work attempt.

VI. The Plaintiff is Not Entitled to Benefits for a Month During her  Reentitlement Period.

The reentitlement period is an additional period of thirty-six months after the nine month trial work period during which an individual may continue to test her ability to work if she has a disabling impairment.  20 C.F.R. § 404.1592a(a); 42 U.S.C. § 423(a).  As discussed above the plaintiff continued to work after the end of her trial work period and engaged in substantial gainful activity for four and a half months thereafter.  The plaintiff's substantial gainful activity after the end of the trial period compels a finding that the plaintiff's disability has ceased.  20 C.F.R. § 404.1592a(a)(1). However, this assumption does not apply in this case because the plaintiff has received DIB benefits for over 24 months and therefore no work activity can be used as evidence that the plaintiff is no longer disabled.  42 U.S.C. § 421(m)(1)(B).

The plaintiff will continue to be paid benefits for the three months following the trial work period in which she performed substantial gainful activity.  20 C.F.R. § 404.1592a(a)(2)(i).  The plaintiff is not entitled to benefits in the month after the three months following the trial work period in which the plaintiff continued to engage in substantial gainful activity.  If a plaintiff's benefits are stopped because the plaintiff engaged in substantial gainful activity the benefits may be resumed without a new application and a new determination of disability if the plaintiff stops engaging in substantial gainful activity in a month during the reentitlement period.  In determining whether the plaintiff engages in substantial gainful activity in a month for purposes of stopping or starting

-26-

benefits during the reentitlement period, only the earnings for that month will be considered. Therefore the plaintiff is entitled to continuing DIB benefits minus the one month in which she performed substantial gainful activity which was three months beyond her trial work period.

VII.   Substantial Evidence in the Record Reveals that the Plaintiff is Entitled to SSI Benefits From June 10, 2001.

The plaintiff filed an application for SSI benefits on July 12, 2001 alleging disability from June 10, 2001 due to screws in her right knee, problems with her left pelvis, left hip, lower back, and depression. (Tr. 877).  In his decision denying the plaintiff SSI on November 9, 2006 the ALJ found that the claimant could return to her past relevant work as a purchasing coordinator, even though the plaintiff had been terminated from this job due to lost time caused by her dislocating right kneecap, low back pain and left hip pain.  (Tr. 893, 710).  The ALJ believed that the plaintiff's knee had stabilized and that the plaintiff could now return to this job.  Id.  Substantial evidence in the record demonstrates that the plaintiff's right knee condition continued to significantly impair the plaintiff's ability to perform substantial gainful activity.  In addition to her left knee condition the plaintiff has established through medical evidence in the record that her back problems and depression limited the plaintiff's functional capacity.  The plaintiff has therefore shown through substantial evidence in the record that she cannot perform substantial gainful activity due to her unresolved right knee condition, her back and pelvis problems and her depression.

The ALJ did not grant proper weight to consultative examiner, Dr. Kochersperger's findings at an examination on August 27, 2001.  (Tr. 710-14).  At this examination the plaintiff complained that she could only sit for about five to ten minutes and could not do any bending or lifting. (Tr. 711).  The plaintiff stated that she experiences pain with sitting and walking and that she has subluxation of the right patellar several times a day.  Id.  Upon examination the plaintiff's straight

leg raising test was 60 degrees bilaterally with left posterior pain and low back pain was noted on the left side, and backward extension of her hips was decreased bilaterally.  (Tr. 711, 713).  Reed's lumbrosacral motion was 0 to 30 degrees with low back discomfort noted, lateral bending at the right was 20 degrees, on the left it was 15 degrees with pain on the left bend,  no scoliosis was found, but Dr. Kochersperger did note that there is left-sided paravertebral muscle spasm.  (Tr. 711-12).  Dr. Kochersperger diagnosed the plaintiff with lumbar syndrome with degenerative disc disease, persistent left hip pain, recurrent subluxation of the patella on the right knee, and bronchial asthma.  (Tr. 712).   Dr. Kochersperger's prognosis was poor and opined that the plaintiff could walk 5-10 minutes, stand 5-10 minutes, sit 10-15 minutes, cannot bend or lift, and must climb stair one at a time.  Id.  His residual functional capacity assessment supports the severity of the plaintiff's impairments and their effect on her ability to engage in substantial gainful activity.

Dr. Kochersperger's residual functional capacity assessment is also supported by the plaintiff's treating physician, Dr. Lecuona's findings.  Reed was examined by Dr. Lecuona on December 31, 2002 for pain in her right knee.  (Tr. 1009).  The plaintiff told Dr. Lecuona that her right kneecap dislocates and that her knee buckles occasionally.  Dr. Lecuona did not find any joint effusion, but did find moderate crepitation on flexion extension of the right knee.  Dr. Lecuona found that the patella subluxates laterally and the plaintiff's main discomfort is anterolaterally and opined that the plaintiff has hypotonic muscles and diagnosed the plaintiff with chondromalacia of the patella with instability of the patella or subluxation of the right patella.  Id.  Dr. Lecuona examined the plaintiff again on April 10, 2006 for continued right knee pain.  (Tr. 1027-28).  The plaintiff complained of recurrent dislocation of the right patella as she had during Dr. Kochersperger's examination.  (Tr. 1027).  Dr. Lecuona noted swelling and increased temperature of the right knee and concluded that the plaintiff's right knee condition had not resolved and continued to impair her ability to perform substantial gainful activity.

Objective evidence in the record also supports both Drs. Lecuona and Kochersperger's finding that the plaintiff's right knee condition was not resolved. The plaintiff underwent x-rays of her right knee on April 10, 2006. (Tr. 1028). Dr. Lecuona reviewed these x-rays which showed two screws in the tibial tuberosity area left from the plaintiff's last surgery. After review of these x-rays Dr. Lecuona opined that the patella is still slightly displaced medially, the plaintiff had a moderate degree of crepitation on flexion extension of the right knee, peripatellar tenderness, and no joint effusion. Dr. Lecuona opined that the plaintiff would be a good candidate for a patellar resurfacing surgery. Id.

Objective medical evidence demonstrates the plaintiff's back and pelvis conditions compromised her ability to perform substantial gainful activity. On April 3, 2002 x-rays were taken of the plaintiff's lumbar spine. (Tr. 683). After review of these x-rays Dr. Lecuona found arthritis of the lumbar vertebra and lateral portion of the pelvis, mild to moderate lipping between L3 and L4 and mild lipping laterally of the hip at the level of the neck and head of the left hip joint. An MRI was performed on the plaintiff's spine by Dr. Christopher P. Rothstein a day after these x-rays. (Tr. 689). Dr. Rothstein noted that there was discogenic disease manifested by partial disc desiccation, disc space narrowing as well as diffuse posterior bulges at L3-L4 and L4-L5, and mild bilateral facet and ligamentous hypertrophy at L4-L5, right side greater than the left. Id. Based on the findings of these images Dr. Lecuona diagnosed the plaintiff with a history of neck pain with x–ray evidence of degenerative disc disease at C3, C4, and C5 with neuropathic pain after an examination on March 3, 2003. (Tr. 1012). On September 2, 2003 the plaintiff underwent an MRI of her cervical spine that Dr. Lecuona opined showed degenerative disc disease at C4-C5 and C5-C6 with associated posterior osteophyte formation causing narrowing of the neural canal without evidence of spinal stenosis. (Tr. 1015).

The plaintiff's depression has been found to impair the plaintiff's ability to function in a work environment.  On June 21, 2001 Dr. Finney diagnosed recurrent major depression with a good prognosis and prescribed Effexor.  (Tr. 806-7).  Psychologist, Dr. C. Richard Noble completed a mental residual functioning capacity assessment on September 3, 2001 after review of the plaintiff's medical file.  (Tr. 721–38).   The plaintiff had a mild degree of limitation on her restriction of activities of daily living, difficulties in maintaining social functioning, deficiencies in maintaining concentration, persistence or pace and no repeated episodes of deterioration.  (Tr. 735).  Dr. Noble diagnosed the plaintiff with depressive disorder due to termination from work.  (Tr. 721).

## **CONCLUSION**

For the reasons set forth above I find that there is substantial evidence in the record to support the plaintiff's claim of disability.  Accordingly the plaintiff's DIB benefits will continue, but a month of payments will be withheld, as discussed above.  The case is remanded to the Secretary for immediate calculation of benefits and payment of SSI benefits consistent with this opinion.

ALL OF THE ABOVE IS SO ORDERED.

S/Michael A. Telesca

_____

MICHAEL A. TELESCA
United States District Judge

Dated:        Rochester, New York
              April 28, 2008